**In re BALTIMORE FOOD SYSTEMS, INC., Debtor.**

**Bankruptcy No. 86–03293.**

United States Bankruptcy Court, D. South Carolina.

Dec. 29, 1986.

---

Marshall Winn, D. Allen Grumbine, and Jeanette Winn, Greenville, S.C., for debtor in possession.

Walter W. Theus, Jr., Columbia, S.C., for Patapsco Village Associates Ltd. Partnership, Martin Financial Associates Ltd. Partnership, and Bel-Ken Associates Ltd. Partnership.

Amos Workman, Spartanburg, S.C., for First Nat. Bank of Maryland.

Gary R. Daves, Columbia, S.C., for Carrollton Bank of Baltimore.

## ORDER DENYING CHANGE OF VENUE

RUFUS W. REYNOLDS, Bankruptcy Judge, Sitting by Designation.

Baltimore Food Systems, Inc. ("Baltimore Foods"), filed a Chapter 11 petition for reorganization in the United States Bankruptcy Court for the District of South Carolina on October 15, 1986, and since that date has continued operations as Debtor in Possession under the protection of this Court. On November 26, 1986, Martin Financial Associates Limited Partnership, Bel-Ken Associates Limited Partnership, and Patapsco Village Associates Limited Partnership (hereinafter, collectively, "Associates") moved to change the venue of this action from the United States Bankruptcy Court for the District of South Carolina to the United States Bankruptcy Court for the District of Maryland, Baltimore Division. On December 3, 1986, First National Bank of Maryland (hereinafter "First National") made a similar motion. Since a motion to change the venue of a bankruptcy case is a "matter concerning the administration of the estate" within the meaning of 28 U.S.C. § 157(b), it is a "core" proceeding under 28 U.S.C. § 157(b)(2)(A). *In re Thomasson*, 60 B.R.

629 (Bankr.M.D.Tenn.1986); *In re Ocean-quest Feeder Service, Inc.*, 56 B.R. 715 (Bankr.D.Conn.1986). This Court, therefore, has jurisdiction over the matter.

On December 12, 1986, after notice to all creditors of pendency of a motion to change venue, the matter was heard upon arguments of counsel for Associates, First National, and Baltimore Foods. Baltimore Foods presented an affidavit of William M. Webster, IV, President of Baltimore Foods, supporting its position, and affidavits of Herman Lubcher, President of Maryland Chicken, a major supplier and creditor of Baltimore Foods; Harry G. Kinder, President of Foodcraft Equipment Co., Inc., a member of the creditors committee and a major creditor of Baltimore Foods; affidavit of Walter Clark, a shareholder of Baltimore Foods; and affidavit of Jesse L. Helms, a member of the creditors committee and corporate credit manager of PYA Monarch, Inc., a major creditor, all in support of Baltimore Foods's request that venue be retained in this Court. In addition, counsel for Carrollton Bank, a major secured creditor, appeared at the hearing and requested on behalf of his client that venue be retained in this Court. Associates and First National (hereinafter "Movants") relied upon statements made at the first meeting of creditors and upon information contained in the petition and schedules but offered no further evidence to support their position.

## MOVANTS' POSITION

Movants, in support of their position, argue that venue should be moved to the District of Maryland because (i) Baltimore Foods is not qualified to do business in the State of South Carolina, (ii) Baltimore Foods's business consists entirely of the operation of 13 "fast food" restaurants in Baltimore, Maryland, (iii) substantially all of Baltimore Foods's tangible personal property is located in Maryland, (iv) a majority of Baltimore Foods's bank accounts are located in Maryland, (v) a majority of Baltimore Foods's unsecured creditors are located in Maryland, (vii) a majority of the creditors holding disputed claims are in Maryland, and (vii) until April, 1986, Baltimore

Foods's management offices were located in Maryland.

Based upon the foregoing it is the Movants' position that venue was improperly laid, at the outset, in the District of South Carolina under 28 U.S.C. § 1408 because Baltimore Foods had neither its principal place of business nor its principal assets in the District of South Carolina for the one hundred eighty days preceding commencement of the case. In the alternative Movants argue that, even if venue had been properly laid in the District of South Carolina at the outset, it should be changed to the District of Maryland "in the interest of justice or for the convenience of the parties" pursuant to 28 U.S.C. § 1412.

## FINDINGS OF FACT

Baltimore Foods, originally incorporated on July 31, 1980, is a franchisee of Bojangles of America and is currently franchised to operate twelve (12) Bojangles restaurants in Maryland. From 1984 through April, 1986, Baltimore Foods's executive offices were located in Maryland under the direction of its then president, Tony Triplette, who was responsible for the total restaurant operation and all financial affairs of Baltimore Foods.

In April, 1986, due to the critical financial situation which had been discovered at Baltimore Foods, Mr. Triplette was terminated and financial control and operational control of Baltimore Foods was transferred to Greenville, South Carolina, under the direction of William M. Webster, IV. As the organization charts attached to Mr. Webster's Affidavit shows, Mr. Webster undertook these responsibilities from April through mid-October, 1986, as Vice President of the company and as President from mid-October, 1986, through the present.

In order to address the financial chaos that existed in Baltimore Foods in April, 1986, Mr. Webster hired John Cheek, a certified public accountant and former controller of Bojangles of America, who worked with him in Greenville to develop a strategy to transfer all existing financial information from Baltimore to Greenville.

In order to save administrative costs for Baltimore Foods, five employees of Carabo, Inc. (another franchisee of Bojangles of America operated by Mr. Webster) who were located in Greenville assisted in the financial reorganization of the company. All major creditors were contacted immediately after the transfer of operational control to Greenville and were notified that all invoices, requests for payments, or questions were to be directed to the office in Greenville. All financial activities concerning Baltimore Foods have been under the control of Mr. Webster in Greenville since late April 1986: the development of an accounting system, the generation of financial statements, the reconstruction of lost or destroyed documents, the development of a financial information package for prospective purchasers/lessees of Baltimore Foods assets, the replacement of insurance coverage, and the completion of all documents and schedules relating to the filing of the Chapter 11 petition. Baltimore Foods's primary bank account is at NCNB South Carolina in Greenville, although there are in addition five bank accounts in Maryland which are strictly depository accounts for the various stores, balances in which are "swept" into the payables account at NCNB South Carolina in Greenville at the close of business each banking day.

In addition to financial control of Baltimore Foods, Mr. Webster has also exercised operational control since late April, 1986. Mr. Webster hired Everette Allen, a North Carolina resident, to relocate to Baltimore to act as Director of Operations there for a six-month period. Mr. Webster directed Mr. Allen in the operation of the various Bojangles locations, providing him with instructions regarding supervisory personnel; financial control at the restaurant level; quality, service, and cleanliness in the restaurants; and operating efficiency. Mr. Webster reviewed inventory reports each week, and changes in operating procedures were made by Mr. Webster. Mr. Webster also developed a set of labor guidelines for implementation by Mr. Allen, and all changes in labor policies were dictated by Mr. Webster. Mr. Webster made

decisions regarding promotional discounts and also made changes in several recipes so as to conform more closely with the recipes authorized by Bojangles of America. At the end of Mr. Allen's tenure, Mr. Webster selected Charles Drye to replace Mr. Allen.

## CONCLUSIONS OF LAW

### I. *Venue at the Commencement of the Case.*

Venue in a case filed under Title 11 is governed by 28 U.S.C. § 1408:

Except as provided in Section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-eighty-day period than the domicile, residence, or principal place of business in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

Baltimore Foods, by filing its petition in the United States Bankruptcy Court for the District of South Carolina, took the position that venue is proper in Greenville, South Carolina. Movants have the burden of proving that venue is improper in the District of South Carolina: i.e., that Greenville, South Carolina, is not the principal place of business of the Debtor. "Since the management of the corporation thus formally indicated the place it regarded as the principal place of business of the bankrupt, a prima facie case in support of jurisdiction in the court which made the adjudication has been established which casts the burden of evidence upon the appellants." *In re Hudson River Navigation Corp.*, 59

F.2d 971 (2d Cir.1932). *See also In re Landmark Capital Co.*, 19 B.R. 342 (Bankr.S.D.N.Y.), *aff'd* 20 B.R. 220 (S.D.N.Y.1982) ("The burden is on the moving party to demonstrate by a fair preponderance of the evidence that a transfer is warranted as the transfer of a case from one district to another is a cumbersome disruption of the Chapter 11 process").

As the court in *In re Commonwealth Oil Refining Co.*, 596 F.2d 1239 (5th Cir. 1979), noted, "[a] history of the Chapter XI venue provision is essential to an understanding of the meaning of principal places of business." 596 F.2d at 1244. Prior to 1973, Section 2(a)(1) of the Bankruptcy Act, 11 U.S.C. § 11(a)(1), limited venue for Chapter 11 cases to the corporation's principal place of business:

> The courts of the United States hereinbefore defined as courts of bankruptcy are ... hereby invested ... with such jurisdiction at law or in equity as will enable them to ...
>
>> (1) Adjudge persons bankrupt who have had their principal place of business, resided, or had their domicile within their respective territorial jurisdictions for the preceding six months, or for a longer portion of the preceding six months than in any other jurisdiction....

In 1973 the adoption of Rule 116(a)(2) changed the Chapter 11 venue provision to allow for venue in both the district where the corporation maintains its principal place of business or its principal assets:

> *Corporation or Partnership.*
>
> A petition by or against a corporation or a partnership may be filed in the district (A) where the bankrupt has had its principal place of business or its principal assets for the preceding 6 months or for a longer portion thereof than in any other district; or, (B) if there is no such district, in any district where the bankrupt has property.

Rule 116 was superseded by 28 U.S.C. § 1472, a part of the Bankruptcy Reform Act of 1978, which was subsequently superseded by the current provision, 28 U.S.C. § 1408, a part of the Bankruptcy Amendments and Federal Judgeship Act of 1984. The language in §§ 1408 and 1472 are virtually identical.

The *Commonwealth Oil* court explained that the change first enacted by Rule 116(a)(2) was significant in two respects: "First, it sheds some doubt on the validity of old case law construing Chapter XI's prior venue statute. Second, the change indicates an intent to expand the districts where a Chapter XI debtor may file by appreciating the fact that a debtor's principal place of business is not necessarily at the same location as its principal assets." 596 F.2d at 1244–1245. The court goes on to point out that "[s]ince the adoption of Rule 116 it is no longer necessary to choose between the place of production and management. The emphasis of earlier decisions on the location of the debtor's production facilities is no longer appropriate because the location of the debtor's principal assets is now an independent basis of venue. Although relevant to an inquiry into a debtor's principal place of business, the change in Rule 116 has greatly diminished its significance." *Id.* The *Commonwealth Oil* court quoted approvingly language from a case dealing with the venue provision of Chapter X of the Bankruptcy Act, which has always contained the alternative basis for venue introduced in Rule 116 for Chapter 11 cases: "[T]he distinction noted in the statute permits administration if the petition is filed in the district where the principal place of business is located, for the very purpose of allowing the internal administration of a company to be settled at the point where those interested in it chose primarily to conduct its business." *Id.* at 1245–1246, citing *In re Portex Oil Co.*, 30 F.Supp. 138 (D.Ore.1939), *aff'd sub nom. Clark Bros. Co. v. Portex Oil Co.*, 113 F.2d 45 (9th Cir.1940).

The *Commonwealth Oil* court concluded that "[a]llowing venue in the district where a debtor manages its business is particularly appropriate in both Chapter X and XI cases. A corporate arrangement or reorganization is primarily a financial proceeding. The debtor is maintained as a going enterprise and its finances are put back in order.

... Where the corporation transacts its corporate business is a logical place for venue in such proceedings." 596 F.2d at 1246.

The facts in the *Commonwealth Oil* case are analogous to those in the instant case. The debtor in *Commonwealth Oil* had its physical plant and all production facilities located in Puerto Rico. 596 F.2d at 1241. Its executive offices were originally in Puerto Rico but had been moved to San Antonio. *Id.* In a footnote the *Commonwealth* court commented that, since the venue provisions consider the location of the debtor's principal place of business only for the six months preceding the bankruptcy filing, prior locations of any executive headquarters are of no relevance to the issue in the case. *Id.* at 1242, n. 5. Similarly, the physical facilities and assets of Baltimore Foods are located in Maryland, and its executive offices were also located there prior to April, 1986, at which time they were moved to Greenville, South Carolina. Since the filing of the petition in bankruptcy occurred on October 15, 1986, the relevant 180–day period would have commenced April 18, 1986. Since Mr. Webster assumed control of the company in late April, 1986, the executive offices have been in Greenville, South Carolina, for nearly all of the 180–day period.

The court in *Commonwealth Oil* concluded that the company's physical operations were controlled from San Antonio, noting that the people in charge of operations at the refinery in Puerto Rico were not authorized to deviate substantially from the production schedule established in San Antonio, with changes to be cleared through San Antonio. 596 F.2d at 1242. Similarly, Mr. Webster developed various procedures to be implemented by Mr. Allen in Maryland, but changes in procedures or guidelines were made by Mr. Webster in Greenville.

The court in *Commonwealth Oil* also found that the "financial heart" of the company was located in San Antonio, noting that management of bank accounts, payment of taxes, preparation of financial reports, and payment of expenses were all done out of the San Antonio office. 596 F.2d at 1243. Similarly, in the instant case, all financial transactions are handled in Greenville, South Carolina, and bank accounts are maintained in Maryland solely for depository purposes in order that the money may be safely transferred to the principal account in Greenville.

The court in *Commonwealth Oil* also noted that, in addition to the location of the company's physical plant in Puerto Rico, most of its products were sold to customers located in Puerto Rico. 596 F.2d at 1243. Likewise, most of the chicken biscuits sold by Baltimore Foods's Bojangles locations are undoubtedly consumed primarily by Maryland residents.

The Court of Appeals for the Fifth Circuit in *Commonwealth Oil* concluded that the debtor, incorporated under the laws of Puerto Rico, nevertheless managed most of its affairs from San Antonio, noting that "the location of a debtor's assets is not particularly significant since the adoption of Rule 116." 596 F.2d at 1246. On the facts presented by that case, the court concluded that the bankruptcy court, which had been reversed by the district court, was not clearly erroneous in locating the debtor's principal place of business in San Antonio. *Id.* at 1247.

Movants rely primarily on *In re Lakeside Utilities*, 18 B.R. 115 (Bankr.D.Neb.1982) for the proposition that the location of the debtor's "executive offices" (which the court described as the "nerve center") was insufficient to constitute the debtor's principal place of business. The *Lakeside* court relied on and quoted *Mahoney v. Northwestern Bell Telephone Co.*, 258 F.Supp. 500 (D.Neb.1966), *aff'd* 377 F.2d 549 (8th Cir.1967): "any 'nerve center' analysis without more '... would create a fictional principal place of business where a company's executive offices are located in one state and all of its business is transacted in another.' " *Mahoney*, 258 F.Supp. at 502. The *Lakeside* case also relies on *Bullock v. Wiebe Construction Co.*, 241 F.Supp. 961 (S.D.Iowa 1965). Importantly, both *Bullock* and *Mahoney* were *diversity disputes* in which the principal place of

business was being ascertained *for purposes of diversity jurisdiction.* A similar argument was made by the govenment of Puerto Rico in the *Commonwealth Oil* case, which the Fifth Circuit addressed in a footnote, concluding that such diversity cases are irrelevant to the analysis under the bankruptcy venue provisions:

> The diversity statute was amended in 1958 to give corporations dual citizenship; in addition to the traditional citizenship in the state of incorporation, a corporation would also be considered a citizen of the state where it has its principal place of business. The purpose of the amendment was to reduce the availability of diversity jurisdiction.... The adoption of Rule 116, on the other hand, was intended to expand venue choices for bankruptcy proceedings. Moreover, one of the purposes of diversity jurisdiction is to protect non-residents from any possible prejudice they might encounter in local court.... A court fixing of a corporation's principal place of business would naturally try to implement this policy. No similar concern informs locating a corporation's principal place of business for bankruptcy proceedings. The policy concerns guiding each choice have little or nothing in common.

*Commonwealth Oil,* 596 F.2d at 1247, n. 17.

It should be noted that the analysis used in the *Commonwealth Oil* case for determining principal place of business "guided" the bankruptcy court in a case cited by Movants, *In re Landmark Capital Co.,* 19 B.R. 342 (Bankr.S.D.N.Y.1982). The *Landmark* court held venue proper when located in the district where the "overall management, coordination and financing of [the debtor's] business" originated, using the "financial heart" analysis adopted in *Commonwealth Oil.* 19 B.R. 342. In fact, the *Landmark* court noted that "courts have refused to hold venue improper on far more tenuous contacts." *Id.*

■ Mr. Webster's affidavit makes it clear that he is the single individual who is necessary to the reorganization and survival of Baltimore Foods. He has served in his capacity as the sole chief executive, operating, and financial officer of the company, entirely without pay and in addition to his duties as the more-than-full-time chief operating officer of Carabo, Inc., to the extent of 35 hours per week (April through June, 1986), 25 hours per week (July through September, 1986), and 40 hours per week (October through December, 1986). The headquarters and principal place of business of Baltimore Foods is in Greenville, South Carolina, and has been there since late April, 1986; because Baltimore Foods depends entirely on Mr. Webster, who is and must remain located in South Carolina, the principal place of business of Baltimore Foods as an entity in reorganization must remain in South Carolina as well.

Therefore, the Court finds that venue is and was from the filing of the petition proper in the District of South Carolina, since executive, operational, and financial control are all exercised from Greenville, South Carolina.

## II. *Retention of Venue.*

■ Even though venue be proper, it is still within the court's discretion to transfer a case to another district if the transfer would be in the interest of justice or for the convenience of the parties:

> A district court may transfer a case or proceeding under Title 11 to a district court for another district, in the interest of justice or for the convenience of the parties.

28 U.S.C. § 1412. Authority for such a transfer is also found in Bankruptcy Rule 1014(a):

> *Transfer of Cases*
>
> (1) *Cases Filed in Proper District.* If a petition is filed in a proper district, on timely motion of a party in interest, and after hearing on notice to the petitioners and to other persons as directed by the court, the case may be transferred to any other district if the court determines that the transfer is for the convenience of the parties and witnesses in the interest of justice.

■ The burden of proof with regard to the convenience to the parties and the interest of justice is again on the Movants. *In re Pennsylvania Consolidated Coal Co.*, 163 F. 579, 585 (E.D.Pa.1908); *In re Landmark Capital Company*, 19 B.R. 342 (Bankr.S.D.N.Y.1982).

The following factors have been used by bankruptcy courts in determining the forum offering the greatest convenience:

1. The proximity of creditors of every kind to the Court;
2. The proximity of the bankrupt (debtor) to the Court;
3. The proximity of the witnessess necessary to the administration of the estate;
4. The location of the assets;
5. The economic administration of the estate;
6. The necessity for ancillary administration if bankruptcy should result.

*In re Commonwealth Oil Refining Co.*, 596 F.2d 1239, 1247 (5th Cir.1979); *see also Landmark*, 19 B.R. 342.

### A. *Economic Administration of the Estate.*

■ As noted by the *Commonwealth Oil* court, the most important of these factors is "whether the requested transfer would promote the economic and efficient administration of the estate." 596 F.2d at 1239; *see also In re Lakeside Utilities*, 18 B.R. 115 (Bankr.D.Neb.1982). As the *Commonwealth Oil* court explained, "[t]he heart of a Chapter XI proceeding is working up a financial plan of arrangement acceptable to all relevant parties," concluding that, since the persons charged with financial responsibility were all located in San Antonio, venue was properly retained in Texas. 596 F.2d at 1247. Precisely the same situation exists in the instant case, where Mr. Webster and his staff working on the financial restructuring of Baltimore Foods are all located in Greenville, South Carolina. Baltimore Foods can be administered much more economically in Greenville than in Baltimore since Mr. Webster is working on the reorganization in addition to discharging his regular duties at Carabo

in Greenville and is doing so without additional compensation from Baltimore Foods. Members of Mr. Webster's Carabo staff in Greenville are also important to the ongoing reorganization. The extra time, effort, and expense which would be required for Mr. Webster to administer the reorganization in Baltimore would be prohibitive, in light of his duties with respect to Carabo in Greenville. In pure economic terms, the transfer of the instant case to the District of Maryland likely would necessitate Mr. Webster's withdrawal from his unpaid efforts for Baltimore Foods and in effect would result in the involuntary conversion of the case to Chapter 7, which would not be in the best economic interest of the creditors.

### B. *Proximity of Creditors.*

The next consideration concerns the proximity to the court of the creditors (which the *Commonwealth Oil* court suggests include stockholders). 596 F.2d at 1248. As has been noted by Movants, by far the largest group of creditors numerically is located in Maryland. On the other hand, several of the creditors with the largest claims, including some of those creditors located in Maryland, have supported retention of the proceeding in the District of South Carolina, as can be seen by Affidavit of Jesse L. Helms, PYA Monarch, Greenville, S.C., whose scheduled claims total $382,333.67; Affidavit of Herman Lubcher, Maryland Chicken, Baltimore, Md., whose scheduled claims total $139,-084.85; and Affidavit of Harry G. Kinder, Foodcraft Equipment Co., Winston-Salem, N.C., whose scheduled claim totals $14,-075.22. In addition, the affidavit of Walter Clark, a shareholder, requests that venue be retained in the District of South Carolina.

### C. *Proximity of Debtor and Witnesses.*

The proximity of the debtor obviously favors retaining venue in the District of South Carolina. In this context, "the concern is with the corporation's employees who must appear in court, not with the employees who are on the production

line.... This also answers the concern with the availability of witnesses." *Commonwealth Oil,* 596 F.2d at 1248. The employees of Baltimore Foods who are intimately familiar with the financial status of the company—which will undoubtedly be the primary subject of interest in this bankruptcy proceeding—are all in Greenville, South Carolina.

### D. *Location of Assets.*

The next factor to be considered is the location of the corporation's assets. Admittedly, the assets are in Maryland. But the location of the assets "is of little importance in a Chapter XI proceeding where the goal is financial rehabilitation, not liquidation." *Commonwealth Oil,* 596 F.2d at 1248. Moreover, in the four cases cited by Movants in which transfer was allowed despite holdings that venue was proper due to the location of the principal assets, the assets in issue were all real estate holdings. *In re Landmark Capital Co.,* 19 B.R. 342; *In re Old Delmar Corp.,* 45 B.R. 883 (Bankr.S.D.N.Y.1985); *In re Eleven Oak Tower Limited Partnership,* 59 B.R. 626 (Bankr.N.D.Ill., E.D.1986); *In re Pickwick Place Limited Partnership,* 63 B.R. 290 (Bankr.N.D.Ill.1986). These cases point out the special consideration to administration at the situs of the assets where those assets consist of real property: "[M]atters concerning real property have always been of local concern and traditionally are decided at the situs of the property." *Old Delmar,* 45 B.R. at 883, citing *First Federal Savings & Loan v. Dew Mortgage Co., Inc. (In re Dew Mortgage Co., Inc.),* 10 B.R. 242 (Bankr.M.D.Fla. 1981). In contrast to these cases, the assets of Baltimore Foods do not include title to real estate, and no similar emphasis upon local concerns need be given.

### E. *Ancillary Administration.*

The last factor to be considered in determining the convenience of the forum is the need for ancillary administration in the event that liquidation occurs. Once again, the *Commonwealth Oil* court addressed the point: " '[A]nticipation of the failure of the Chapter XI proceeding is an illogical

basis upon which to predicate a transfer.' " 596 F.2d at 1248, quoting *In re Fairfield Puerto Rico, Inc.,* 333 F.Supp. 1187, 1191 (D.Del.1971).

### F. *The Interest of Justice.*

In addition to considering the convenience of the parties, 28 U.S.C. § 1412 also instructs the court to account for the interest of justice. Baltimore Foods has recognized its obligations to its various creditors and is attempting to work out a solution which will maximize the chances for repayment to those creditors. That goal will best be served by maintaining Baltimore Foods as a functioning corporation in reorganization. The same conclusion reached in the *Commonwealth Oil* case is applicable here: the troubles of Baltimore Foods are financial; the people who can solve those problems for Baltimore Foods are in Greenville, South Carolina. *See* 596 F.2d at 1248. The continued operation of Baltimore Foods depends upon this case's being retained in the District of South Carolina.

In light of the foregoing factors, particularly the importance of the economic and efficient administration of the reorganization, venue of this case shall be retained in the District of South Carolina. It is in South Carolina—where the debtor *actually administers the estate*—that the convenience of the parties will best be satisfied and the interest of justice will best be served.

### III. *Discretion to Retain Venue.*

■ Even assuming, *arguendo,* that the instant case was not properly filed in the District of South Carolina, the court may retain the case using the same analysis as already discussed in evaluating the convenience of the parties and the interest of justice, according to Rule 1014(a)(2):

(2) *Cases Filed in Improper District.* If a petition is filed in an improper district, on timely motion of a party in interest and after hearing on notice to the petitioners and to other persons as directed by the court, the case may be retained or transferred to any other district if the

court determines if the retention or transfer is for the convenience of the parties and witnesses in the interest of justice. Notwithstanding the foregoing, if no objection is raised, the court may, without a hearing, retain a case filed in an improper district.

Movants assert in their memorandum that the authority to retain an improperly filed case no longer exists as a result of the enactment of 28 U.S.C. § 1412, under the Bankruptcy Amendments and Federal Judgeship Act of 1984, although Movants cite no authority for the proposition. This very issue was considered by the court in *In re Leonard,* 55 B.R. 106 (Bankr.D.D.C. 1985), which reached the following conclusion:

> There is no legislative history which suggests in any way an intent to make a substantive change in the law. Section 1412 permits a transfer to any other district. ... It would make no sense to permit a transfer to any other district, i.e., one in which venue might be improper, and not to permit retention in an improper venue. It would be anomalous to conclude that a debtor is prohibited from starting out in an improper venue when the case could be transferred to a improper venue. I hold, therefore, that, if Congress did intend to repeal both § 1475, relating to transfer to any other district, ... and also § 1477, relating to retention in an improper forum, and substitute therefor the new § 1412, the most probable intention of Congress was simply to streamline the language and not to make a substantive change. Congress may have believed that the power to retain an improperly venued case is implied, without the necessity for explicit authorization, so long as the district-court venue chapter of title 28 contains no provision at all for dismissal of bankruptcy cases brought in an improper venue, and so long as the transfer-of-venue provision of that chapter is couched in permisssive rather than mandatory language.... Other possibilities exist, of course. Congress may have intended that new § 1412, granting district courts the power to transfer cases, would sim-

ply leave unaffected both § 1475 and § 1477, which granted bankrupty courts the power to either transfer or retain cases.

If Congress's intent is unclear, then under the general rule of statutory construction as to mutually exclusive statutes passed on, and effective on, the same date, § 1477 would remain unaffected by either provision. *See* 1A Sutherland Statutory Construction, § 23.17 (4th ed. 1972). Therefore, I conclude that this Court continues to have the authority to retain this case, even though venue is improper, "in the interest of justice and for the convenience of the parties."

55 B.R. 106; *accord, In re Boeckman,* 54 B.R. 110 (Bankr.D.S.D.1985).

Accordingly, even if venue initially had been improperly laid in South Carolina, this court has the power and authority to retain the case under Bankruptcy Rule 1014(a)(2), and for the reasons specified above, venue of this case shall be retained in the District of South Carolina.

It Is therefore ORDERED, ADJUDGED and DECREED that venue of this case shall be retained by this Court.